# In the United States Court of Federal Claims

No. 16-829

Filed: December 5, 2016*

| | |
|---|---|
| ******************************************* | Administrative Procedures Act ("APA"), 5 U.S.C. § 706; |
| LEVEL 3 COMMUNICATIONS, LLC, | Bid Protest Jurisdiction, 28 U.S.C. § 1491; |
| Plaintiff, | Contract Award Procedures, 10 U.S.C § 2305; |
| v. | Defense Federal Acquisition Regulation Supplement ("DFARS") 252.239-7005, 252.239-7006; |
| THE UNITED STATES, | Federal Acquisition Regulation ("FAR") 14.405, 15.101-2, 15.305(a), 15.306(a), 16.703, 52.249-14; |
| Defendant, | Rules of the United States Court of Federal Claims ("RCFC") 11(b), 52.2, 54(d)(1). |
| and | |
| VERIZON DEUTSCHLAND GMBH, | |
| Defendant-Intervenor. | |
| ******************************************* | |

**Shelly Lynn Ewald**, Watt, Tieder, Hoffar, & Fitzgerald, LLP, McLean, Virginia, Counsel for Plaintiff.

**Robert C. Bigler**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

**Jonathan D. Shaffer**, Smith Pachter McWhorter PLC, Tysons Corner, Virginia, Counsel for the Defendant-Intervenor.

## MEMORANDUM OPINION RESOLVING CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND ISSUING PERMANENT INJUNCTION

**BRADEN**, *Judge*.

\* On November 30, 2016, the court forwarded a sealed copy of this Memorandum Opinion And Permanent Injunction to the parties to redact any confidential and/or privileged information from the public version and note any citation or editorial errors requiring correction. On December 5, 2016, Verizon Deutschland GmbH submitted proposed redactions and indicated that counsel for the Government and Level 3 Communications, LLC did not oppose the redactions. The court has incorporated these proposed redactions, and corrected or clarified certain portions herein.

This bid protest concerns the Defense Information Systems Agency's decision to award a federal contract for construction and maintenance of a Structured, High Availability Telecommunications Circuit between Wiesbaden, Germany and Arifjan, Kuwait to Verizon Deutschland GmbH at a price of $38.6 million **more** than the bid of Level 3 Communications, LLC, the company that had been performing on the job for several years.  Today, the court has entered an injunction to prohibit any further work from being performed under this contract, but also ordered the Defense Information Systems Agency ("DISA") to provide its files in this matter to the Inspector General of the Department of Defense for further investigation, particularly in light of the fact that lawyers from the Department of Justice and DISA informed the court, both in writing and at oral argument, that performance would not commence until December 1, 2016.  In fact, performance began on June 29, 2016 and DISA "accepted" a completed telecommunications circuit on November 1, 2016—only a few days before the November 8, 2016 election.  Although the court has authority to issue sanctions against the lawyers involved, the Inspector General has authority to ensure the integrity of the procurement process, and the Senate Armed Services Committee has oversight responsibility determine whether the American taxpayers are served by this type of procurement, albeit in support of our military requirements in the Middle East.

To facilitate review of this Memorandum Opinion, the court has provided the following outline:

**I.  Factual Background.**

**II.  Procedural History.**

**III. Discussion.**

    **A.  Jurisdiction.**

    **B.  Standing.**

    **C.  Standard Of Review.**

    **D.  The Parties' Cross-Motions For Judgment On The Administrative Record.**

        **1.  Level 3 Communications, LLC's Argument.**

        **2.  The Government's Response.**

        **3.  Verizon Deutschland GmbH's Response.**

        **4.  The Court's Resolution.**

            **a.  The Contracting Officer's Decision Not To Seek A "Clarification" Was Arbitrary, Capricious, And An Abuse Of Discretion.**

          **b.  The Contracting Officer's Decision Regarding NALLA Accreditation Was Arbitrary, Capricious, And An Abuse Of Discretion.**

          **c.  The Contracting Officer's Decision Not To Seek Negotiations With Offerors Was Arbitrary, Capricious, And An Abuse Of Discretion.**

      **E.  Level 3 Communications, LLC Is Entitled To Injunctive Relief.**

**IV.  Conclusion.**

**I.   FACTUAL BACKGROUND.[1]**

On August 28, 2015, the Defense Information Systems Agency ("DISA") issued Solicitation HC1021-15-T-3033 ("the Solicitation") seeking a STM 64, AU4 Structured, High Availability Telecommunications Circuit ("the circuit") between Wiesbaden, Germany and Arifjan, Kuwait with an original service date of November 30, 2015.  AR Tab 5, at 150.  After amendments to the Solicitation, the service date was revised to May 2, 2016.  AR Tab 7, at 271.

The Solicitation requested offers for a fixed-price, indefinite-term delivery order for telecommunications installation, service, and maintenance, for an estimated service period of 60 months, *i.e.*, 5 years.  AR Tab 5, at 156 ("All charges shall be understood to be firm fixed prices for the life of the contract."); AR Tab 5, at 158 ("Contract for this telecommunication service shall be an indefinite term contract with an estimated contract period of 60 months.").

Pursuant to paragraph M(6) of the Solicitation, telecommunication providers ("TPs") were requested to submit offers to install and maintain two circuit "paths:" a "protect path" that could traverse the bodies of water between Germany and Kuwait, and a "working path" that traversed only dry land.  AR Tab 5, at 153.  Paragraph M(6) also instructed offerors that the protect path and the working path could not traverse or touch a list of nations, including Iran.  AR Tab 5, at 153.

Award of the contract was to be made to an offeror that submitted the lowest-priced, technically acceptable quote: "[q]uotes received in response to this Inquiry will be evaluated for technical sufficiency, ability to meet required service date, past performance, and total price."  AR Tab 5, at 157.   Section A.1 of the Solicitation provided that:

> [a]fter the receipt of quotes, the government will first evaluate the lowest price quote. If the lowest price quote is determined to be technically acceptable and otherwise properly awardable, no further evaluations will be conducted, and award will be made. If, however, *the lowest price quote is determined to be technically unacceptable* and/or otherwise not properly awardable, the *next lowest price quote*

---

[1] The facts discussed herein were derived from the July 20, 2016 Administrative Record ("AR Tabs 1–31," at 1–1253).

*will be evaluated until a quote is deemed technically acceptable* and otherwise
properly awardable.

AR Tab 5, at 150 (emphasis added).

Level 3 Communications, LLC ("Level 3") and Verizon Deutschland GmbH ("Verizon"),
and six other companies,[2] submitted offers by the October 28, 2015 submission deadline. AR Tab
14, at 498; *see also* AR Tab 10, at 340 (Solicitation amendment changing submission deadline to
October 28, 2015).

Level 3 was the incumbent contractor and current provider of the existing
telecommunications circuit between Wiesbaden, Germany, and Arifjan, Kuwait. AR Tab 11, at
392. Level 3 had provided this circuit for approximately two years. AR Tab 20, at 983. Level 3's
offer stated that the new circuit would follow the same working path, and did not traverse Iran.
AR Tab 11, at 392 ("Level 3's proposal utilizes a working path that is identical to the current [path]
from Camp Arifjan to Wiesbaden."); AR Tab 11, at 397 ("Working path does not touch or go
through Iran[.]"). Level 3 also submitted the lowest price of $60,128,000 for installation and 60
months of maintenance. AR Tab 15, at 504.

On November 19, 2015, DISA's Technical Evaluation Team ("TET") evaluated Level 3's
proposal to determine technically acceptability. AR Tab 23A, at 1067 (Nov. 19, 2015 TET email
with consolidated technical evaluation).[3] On November 23, 2015, the Contract Specialist
responded to the TET's evaluation:

I can see that you determined [Level 3's] *proposed routing to be acceptable* based on the
maps/drawings/diagrams included in [Level 3's] quote[.] [H]owever, I cannot find
information . . . which documents how [Level 3's] response to Standard Provision (SP) 39
was determined to be acceptable. Remember, SP39 states the TP must submit with its
quote submission a .kmz/.kml file (which [Level 3] failed to do).

---

[2] Of the eight offerors, only six complied with Standard Provision 8 of the Solicitation,
requiring that only National Long Line Agencies ("NALLA") accredited TPs could receive service
orders under the proposed contract. AR Tab 15, at 501; AR Tab 5, at 156 (Standard Provision 8).
The six companies that complied with NALLA included Verizon, Level 3, and four other
companies. The three companies, other than Level 3, that submitted offers lower than Verizon are
referred to herein as "Companies B, E, and F." AR Tab 15, at 501. Documents in the
Administrative Record refer to Verizon as "Company A" and Level 3 as "Company C." AR Tab
15, at 501. Another NALLA compliant company submitted an offer that was higher than
Verizon's, but this offer was not considered for award. AR Tab 15, at 504.

[3] The Administrative Record includes the November 19, 2016 e-mail but does not include
the TET's "Quote Evaluation Sheet" ("QES"). AR Tab 23A, at 1067. The July 12, 2016
Complaint, as amended on September 29, 2016, alleges that the initial TET evaluation was
favorable. Amend. Comp. at ¶ 22.

AR Tab 20, at 913 (emphasis added).

The Contract Specialist also raised two additional concerns: (1) Level 3's offer did not expressly state that its subcontractor for the nation of Turkey was an accredited National Long Line Agencies ("NALLA") subcontractor;[4] and (2) Level 3's circuit route between Istanbul, Turkey, and Budapest, Hungary, was "completely UNCLEAR," because of gaps in the diagram between Stara Zagora, Bulgaria, and Budapest, Hungary.  AR Tab 20, at 913. The Contract Specialist requested that "[w]ith the above in mind, could [the TET] please have a look at the quote again, and advise."  AR Tab 20, at 914.

That same day, a member of the TET also advised the Contract Specialist that:

> [t]here are gaps in the diagrams between Stara Zagora, Bulgaria, and Budapest, Hungary and Ivancice, Czech Republic. *Please ask the offeror to provide the detailed routing .kmz/.kml file.*  The file should provide a more detailed routing between Bulgaria and Hungary as well as the routing between Hungary and Czech Republic.

---

[4] Standard Provision 8 of the Solicitation provided:

One or more end points of this circuit terminate in NATO countries that have National Long Lines Agencies (NALLAs) and NALLA accredited Telecommunication Providers (TPs). As a member and signatory in North Atlantic Treaty Organization (NATO), the U.S. Department of Defense acquires its military telecommunication services in accordance with NATO requirements specified in Alliance Long Lines Activity (ALLA) handbook. Therefore, only TPs accredited by NALLAs of respective NATO countries will be eligible to receive any Order or Circuit Demand resulting from this Inquiry, for NATO country portions of this circuit. Additionally, only NALLA accredited TPs can be used as subcontractor TP in NATO countries.  In NATO countries having no NALLA and/or NALLA accredited TP, quotes from TPs possessing authorization to provide communication services from appropriate national authority will be considered. Quotes shall identify portions of service that will be provided using TP's own facilities as well as those that will be provided by subcontractor TPs, and shall identify all subcontractor TPs. Additionally, quotes shall provide evidence TP and all subcontractor TPs possess required NALLA accreditations or national authority authorizations for countries where this circuit terminates. Evidence of such NALLA accreditation and national authority authorizations for TP and all subcontractor TPs is a definitive responsibility criterion.

ACCEPTABLE TELECOMMUNICATIONS PROVIDER (TP) RESPONSE: "UNDERSTAND," and identify all portions of service provided by TP and all portions of the service provided by subcontractor TPs, plus provide evidence that TP and all subcontractor TPs possess required NALLA accreditations and national authority authorizations.

AR Tab 5, at 156.

AR Tab 20, at 912 (emphasis added).

The Contracting Officer ("CO"), however, decided not to request that Level 3 provide detailed routing .kmz/.kml files or to request any clarification from Level 3, although Level 3 was currently maintaining the circuit that did not traverse Iran.  AR Tab 20, at 574 ("The [CO] did not seek clarification, enter discussions, or engage in negotiations with any offerors at any time.").

Without the clarification requested by the TET member, the CO-issued Technical Evaluation Results stated that

> [w]ith lack of information primarily resulting from the fact that [Level 3] failed to provide with its quote submission material explicitly requested in the RFQ (path documentation in the format of .kmz or .kml routing maps), the Government was not able to finalize evaluation of Level 3's quote . . . unless the Government would have determined it necessary to conduct negotiations with offerors, which had enabled TPs to cure material omissions and/or submit a final revised quote . . . .  As the determination of whether it is necessary to conduct negotiations with offerors in this full and open competition environment cannot be made unless all quotes received in response to the RFQ from TPs being eligible for award have been sent to and evaluated by the TET, the next lowest priced quote [was evaluated]."

AR Tab 15, at 501–02.

In short, the CO elected not to obtain clarifying information from Level 3, as requested by the TET member.  Therefore, the TET proceeded to evaluate the next lowest priced offers and found the next three lowest priced offerors[5] were "technically unacceptable."  AR Tab 15, at 502.  And, in a "subsequent step," the TET changed its prior decision finding Level 3's offer "technically acceptable," to finding the offer "technically unacceptable."  AR Tab 15, at 503.  On November 23, 2015,[6] the TET issued a Quotation Evaluation Sheet ("QES") explaining why Level 3's offer was deemed "technically unacceptable:"

---

[5] These offerors were Companies B, E, and F.  AR Tab 15, at 503.

[6] The court believes that the November 23, 2015 date of evaluation on the QES is incorrect, because the TET e-mails reflect that the TET members were still considering whether Level 3 was technically acceptable as of 3:52 pm on November 23, 2015.  AR Tab 20, at 912.  The concerns raised in the November 23, 2015 e-mails are also different from the grounds on which Level 3's offer was found to be "technically unacceptable:" *i.e.*, the Contract Specialist ("CS") was concerned with the route between Turkey and Hungary, *not* whether the route came into contact with Iran.  AR Tab 20, at 913.  Moreover, on January 22, 2016, the CS e-mailed the CO and the TET member to inform that a QES had not been submitted for Level 3 as of that date.  AR Tab 20, at 912.

- First, Level 3's working path "passes through Iran south of the Kanaquin PoP.[7]"

- Second, Level 3 did not provide a .kmz file as required in Standard Provision 39.

- Third, Level 3's quote identified a subcontractor—"NT"—for Turkey, but did not state whether the subcontractor was NALLA accredited, as required in Standard Provision 8.

AR Tab 20, at 962.

On February 8, 2016, Verizon's offer was evaluated and determined to be "technically acceptable". AR Tab 15, at 527. Verizon's price, however, was $98,664,800.00, approximately $38.6 million *more* than Level 3's offer. AR Tab 15, at 504. Nevertheless, on March 8, 2016, Verizon was awarded the contract and received a circuit demand requesting the provision of telecommunications circuit ALLA 660038, a 10GB circuit between Wiesbaden, Germany and Camp Arifjan, Kuwait. AR Tab 16B, at 532.

On November 1, 2016, DISA accepted a completed telecommunications circuit from Verizon and Verizon commenced performance of the contract, although the court was informed, in writing on August 23, 2016, and orally on September 15, 2016, that performance would not commence until December 1, 2016.

## II.   PROCEDURAL HISTORY.

On March 14, 2016, after receiving notice of award, Level 3 filed a protest with the Government Accountability Office ("GAO"), arguing that (1) DISA's determination that Level 3's offer was technically unacceptable was unreasonable, and (2) that Verizon's offer took exception to mandatory Solicitation requirements. *See Matter of: Level 3 Communications LLC*, B-412854.1 (Comp. Gen.), 2016 WL 3568223 at *2. On June 21, 2016, the GAO denied Level 3's protest, finding that DISA's determination was not unreasonable and finding that Level 3's arguments concerning the award to Verizon "provide no basis on which to sustain the protest." *See id.* at *7.

On July 12, 2016, Level 3 filed a Complaint ("Compl.") in the United States Court of Federal Claims. ECF No. 1. On that same day, Level 3 also filed: a Motion For Preliminary Injunction; a Memorandum In Support Of Motion For A Preliminary Injunction; a Motion For Protective Order; a Motion To Seal The Complaint And Memorandum In Support Of Motion For A Preliminary Injunction; a Notice Of Related Case(s) (stating that Level 3 was unaware of any related cases pending before the court); and a Rule 7.1 of the Rules of the United States Court of Federal Claims ("RCFC") Disclosure Statement. ECF Nos. 5–6, 8–11.

---

[7] A "point of presence" ("PoP") is the physical location where a long distance telecommunications carrier interfaces with the local network. *See Glossary of Telecom Terms*, VERIZON PARTNER SOLUTIONS, https://www22.verizon.com/wholesale/glossary/Glossary-of-Telecom-Terms-p.html.

On July 13, 2016, Verizon filed an Unopposed Motion To Intervene that the court granted and also filed a RCFC 7.1 Disclosure Statement.  ECF No. 12.  That same day, the court also granted Level 3's July 12, 2016 Motion For A Protective Order.  ECF No. 14.  On that same day, Level 3 filed, under seal, a Motion For Temporary Restraining Order and attached a Memorandum In Support of the motion.  ECF No. 19.

On July 14, 2016, the parties filed a Proposed Schedule.  ECF No. 20.  That same day, the court issued a Scheduling Order.  ECF No. 21.

On July 20, 2016, the Government filed, under seal, an Opposition To Level 3's Motion For A Preliminary Injunction And Appendix.  ECF No. 27.  That same day, the Government also filed the Administrative Record, under seal.  ECF No. 28.  On July 22, 2016, Level 3 filed, under seal, a Brief In Reply To the Government's Opposition To Plaintiff's Motion For A Preliminary Injunction and attached the July 21, 2016 Declaration of John Shuttleworth, Senior Director of Sales Engineers for Level 3 and the July 21, 2016 Declaration of Robert A. Crinks, President of 89Degree Networks, LLC (Level 3's subcontractor).  ECF No. 29.

On August 1, 2016, the court convened a telephone status conference to discuss the status of the contract.  On August 3, 2016, the court issued an order to schedule Oral Argument at the National Courts Building in Washington, D.C. at 2:30 p.m. EST on September 15, 2016.  ECF No. 32.

On August 11, 2016, Level 3 filed, under seal, a Motion For Judgment On The Administrative Record And For Permanent Injunction and attached a Memorandum Of Law In Support of the motion ("Pl. Mem.").  ECF No. 35.

On August 23, 2016, the Government filed, under seal, a Response To Plaintiff's Motion For Judgment On The Administrative Record And Cross Motion For Judgment On The Administrative Record ("Gov't Resp.") and attached an Appendix.  ECF No. 36.  That same day, Verizon filed, under seal, a Response To Level 3's Motion For Judgment On The Administrative Record And Cross Motion For Judgment On The Administrative Record ("D.I. Resp.").  ECF No. 37.  In the August 23, 2016 Response, the Government represented that Verizon would not begin performance until December 1, 2016.  Gov't Resp. at 25 ("In contrast to Level 3's failure to put forward any claim of irreparable harm, the Government would be significantly harmed if the Court enters an injunction preventing Verizon from proceeding with preparation for its contract *so that it can begin performance on December 1, 2016*." (emphasis added)).

On August 29, 2016, Level 3 filed a Brief In Reply To The Government And Verizon's Oppositions And Response To The Government And Verizon's Cross Motions ("Pl. Reply").  ECF No. 38.

On September 2, 2016, Verizon filed a Reply ("D.I. Reply").  On that same day, the Government also filed a Reply ("Gov't Reply").

On September 15, 2016, the court convened an Oral Argument on the parties' Cross-Motions For Judgment On The Administrative Record.  ECF No. 42 ("9/15/2016 TR").  During the Oral Argument, the court suggested that Level 3 file an Amended Complaint, since the July 12, 2016 Complaint did not identify which statutes or regulations that DISA violated by granting

an award to Verizon. 9/15/2016 TR at 6–7. In addition, the court asked the Government's counsel about the status of the contract, and the Government represented that Verizon was preparing to perform on December 1, 2016:

> [THE COURT]: So tell me what's happening right now. Verizon has the contract. What are they doing?
>
> [THE GOVERNMENT]: No, I know, Your Honor. *Verizon, right now, is preparing to perform on December 1st.*

9/15/2016 TR at 40 (emphasis added).

On September 29, 2016, Level 3 filed an Amended Complaint. ECF No. 43.

On November 9, 2016, the court's law clerk sent an e-mail to the parties to inquire whether Verizon still intended to commence performance on December 1, 2016. ECF No. 52. On November 10, 2016, the Government responded that: "Verizon was able to complete the circuit ahead of schedule and the Government accepted the circuit and began using the circuit on November 1, 2016." ECF No. 52.

On November 14, 2016, the court convened a hearing to confirm the current status of the contract. ECF No. 48 ("11/14/16 TR"). During the hearing the Government represented that DISA had accepted a complete circuit from Verizon on November 1, 2016. 11/14/16 TR at 4. The Government confirmed that it failed to inform either the court or Level 3 that performance commenced prior to December 1, 2016. 11/14/16 TR at 9.

In response, on that same day, the court issued a Memorandum Opinion And Temporary Restraining Order, prohibiting DISA from allowing Verizon to continue performing under the contract. *See Level 3 Communications, LLC v. United States*, No. 16-829, 2016 WL 6694969, at *3 (Fed. Cl. Nov. 14, 2016).

On November 18, 2016, the Government filed a sealed status report to update the court about the work that Verizon performed to date and the amount that has been paid or is due to Verizon. ECF No. 50. In an attached declaration, the CO stated that Verizon began the "provisioning process to install the circuit per the contract," on June 29, 2016, after GAO issued its ruling, and that Verizon completed work on the circuit on November 1, 2016. ECF No 50-1 at ¶¶ 5–6. In addition, the CO stated that, under Verizon's offer, the set up process carried a $ […] "non-recurring cost," that would be billed to DISA. ECF No. 50-1 at ¶ 13. Since DISA accepted the circuit on November 1, 2016, the court was informed that Verizon apparently was also owed $ […] for one month of service. ECF No 50-1 at ¶ 13.

On November 21, 2016 the Government submitted an additional status report, confirming that contract "performance" commenced on June 29, 2016. ECF No. 51 at 7.

## III.   DISCUSSION.

### A.   Jurisdiction.

Under the Administrative Dispute Resolution Act of 1995 ("ADRA"), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency or proposals for a proposed contract or to a proposed award of a contract or any alleged violation of statute or regulation *in connection with a procurement or a proposed procurement.*

28 U.S.C. § 1491(b)(1) (emphasis added).

Count I of the September 29, 2016 Amended Complaint alleges that DISA violated 10 U.S.C. § 2305(b)(1)[8] and FAR 15.305(a),[9] 15.306(a),[10] and 15.101-2,[11] in evaluating Level 3 and Verizon's offers.   Amend. Compl. at ¶¶ 100–108.   Count II alleges that DISA's decision to award the contract was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of 5 U.S.C. § 706.[12]   Amend. Compl. at ¶¶ 109–116.

### B.   Standing.

As a threshold matter, a plaintiff in a bid protest must establish standing by demonstrating that it is an "interested party," pursuant to 28 U.S.C. § 1491(b)(1).   *See Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue.").   An "interested party'" is any actual or prospective offeror whose "direct economic interest would be affected by the award of the contract or by a failure to award the contract."   *American Fed'n Of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001).   In this case, Level 3 submitted a timely offer in response to the October 22, 2015 Amended Solicitation.   AR Tab 10, at 340 (Amendment to Solicitation setting the due date as October 28, 2015); AR Tab 12, at 341 (Level 3's offer was submitted October 28, 2015). Necessarily, Level 3's direct economic interest was affected by DISA's decision to award the Contract to Verizon.   Therefore, the September 29, 2016 Amended Complaint properly alleged that Level 3 is an "interested party."

In addition to alleging that the plaintiff is an interested party, the complaint in a bid protest must also allege sufficient facts to show that the plaintiff has been prejudiced by the award to

---

[8] Relevant portions of 10 U.S.C. § 2305 are set forth in the attached Court Appendix.

[9] Relevant portions of FAR 15.305(a) are set forth in the attached Court Appendix.

[10] Relevant portions of FAR 15.306(a) are set forth in the attached Court Appendix.

[11] FAR 15.101-2 is set forth in the attached Court Appendix.

[12] 5 U.S.C. § 706 is set forth in the attached Court Appendix.

another bidder.  *See Information Technology & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("In order to establish standing, [the plaintiff] must show that it is . . . an interested party, prejudiced by the award to [another bidder.]").  To establish prejudice, the complaint must allege that a "significant error" was made during the procurement process, and "there was a substantial chance it would have received the contract award[,] but for that error." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (internal citations and quotation marks omitted).  But, the United States Court of Appeals for the Federal Circuit has instructed that the test for prejudice "is more lenient than showing actual causation," because the plaintiff need not "show[] that but for the errors [it] would have *won* the contract." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) (emphasis added).  Instead, the complaint must allege that the plaintiff has a "greater than insubstantial chance of securing the contract[,] if successful on the merits of the bid protest," *i.e.*, a "substantial chance" of receiving award.  *See Information Technology & Applications Corp.*, 316 F.3d at 1319.

In this case, Level 3 had a "substantial chance" of being awarded the contract, but for DISA's arbitrary and capricious actions, and abuse of discretion, in evaluating Level 3's offer.  Specifically, under the terms of the October 22, 2015 Solicitation, the contract was to be awarded to the "lowest price quote," that also was determined to "be technically acceptable and otherwise properly awardable." AR Tab 5, at 150.  Level 3 submitted the lowest offer of $60,128,000. AR Tab 14, at 498.  Level 3 did not receive award, however, because its offer was not deemed "technically acceptable." AR Tab 15, at 582.  The September 29, 2016 Complaint alleges that DISA violated 10 U.S.C. § 2305(b)(1), as well as Federal Acquisition Regulation ("FAR") 15.305(a), 15.306(a), and 15.101-2 by unlawfully awarding the contract to Verizon, because Level 3's offer was the lowest price quote and was "technically acceptable." Amend. Compl. at ¶¶100–116.  Under these circumstances, Level 3 established a "substantial chance" of receiving the contract under the Solicitation.  For these reasons, the court has determined that Level 3 has established standing to seek an adjudication of this bid protest.

## C. Standard Of Review.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), Congress authorized the United States Court of Federal Claims to adjudicate bird protests under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Supp., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted).

As the United States Court of Appeals for the Federal Circuit has held, the court's primary responsibility in a bid protest is to determine whether a federal agency violated a federal statute or regulation in the procurement process and whether any such violation was prejudicial.  *See Axiom*

*Res. Mgmt. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (holding that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations") (internal quotation marks and citations omitted).

If no prejudicial violation of law or regulation is found, the court next is required to determine whether the agency decision evidences a rational basis. *See Savantage Fin. Servs. Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (holding that a court "must sustain an agency action unless the action does not evidence rational reasoning and consideration of relevant factors") (quotations omitted); *see also Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001) (holding that to meet the burden of showing that a sole-source award lacks rational basis, the plaintiff must show: "(1) the agency's decision to conduct a sole-source procurement process lacked a rational basis; (2) the agency's sole-source requirements lacked a rational basis; *or* (3) based on the sole-source requirements, the selection of the sole-source awardee lacked a rational basis").

Finally, the court is required to ascertain whether the federal agency otherwise acted in an arbitrary and capricious manner with respect to the procurement at issue. *See Banknote Corp.*, 365 F.3d at 1350 ("[A] reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion.'"). In particular, the United States Supreme Court has held that a federal agency's decision is arbitrary and capricious, when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**D.      The Parties' Cross-Motions for Judgment On The Administrative Record.**

**1.      Level 3 Communications, LLC's Argument.**

Level 3 seeks a permanent injunction barring DISA from proceeding with any further performance of the contract, with any entity other than Level 3, or, alternatively, an order requiring DISA to reevaluate or re-solicit proposals. Pl. Mem. at 2. Level 3 submitted the lowest-priced, "technically acceptable" offer and the decision that Level 3's offer was not "technically acceptable" was arbitrary, capricious, and contrary to law. Pl. Mem. at 2. Furthermore, the decision to award the contract to Verizon was arbitrary, capricious, and contrary to law because Verizon's offer was not "technically acceptable." Pl. Mem. at 2.

Level 3 argues that Verizon's proposal was not "technically acceptable," because Verizon took exception to material requirements of the Solicitation. Pl. Mem. at 20. To be eligible for an award, a bidder must meet all material requirements of solicitation; "[i]f a bidder attempts to impose conditions that would modify material requirements, the bid is not responsive and must be rejected." *Tel-Instrument Elec. Corp. v. U.S.*, 56 Fed. Cl. 174, 176 (2003), *aff'd*, 87 F. App'x 752 (Fed. Cir. 2004). Verizon, however, *sua sponte* modified four material requirements: (1) Verizon required a 150 day lead time and therefore did not meet the required service date, a condition precedent to award under Standard Provision 24 of the Solicitation and a mandatory requirement of Standard Provision 42; (2) Verizon conditioned compliance with the Solicitation's Permit requirements, set forth in Standard Provision 27, by requiring that any delay in performance, resulting from the time needed to obtain permits, "shall" be an excusable delay; (3) Verizon did

not comply with the Solicitation's requirement to submit a firm fixed-price quote, but instead responded that Verizon should be able to renegotiate the contract price, in the event of new taxes or similar charges; and (4) Verizon conditioned the Solicitation's Circuit Parameters Requirements, if there were unforeseeable events, such as a severed cable. Pl. Mem. at 21.

First, with respect to the service date, Standard Provision 24 stated that an award would be made to the offeror "whose quote is determined to be the lowest priced, technically acceptable and *meets the Government's service date*." AR Tab 5, at 157 (emphasis added).  Paragraph E of the Solicitation, and subsequent amendments, set the service date as May 2, 2016.  AR Tab 7, at 269. Standard Provision 42 of the Solicitation also required all offerors to confirm their ability to meet the required service date.  AR Tab 5, at 160.  Verizon's offer, however, stated that "lead time for this order is 150 calendar days.  Verizon can provide the circuit by 02 May 2016 if the award is received by 04 December 2015."  AR Tab 12A, at 434.  When DISA evaluated and awarded the contract to Verizon on March 8, 2016, DISA knew that Verizon could *not* meet the required service date, because of the 150 day lead time.  Pl. Mem. at 22.  In contrast, Level 3's offer required a lead time of only "60 days from Award."  AR Tab 11A, at 392.  Therefore, on March 8, 2016 when DISA awarded the contract to Verizon, DISA knew that Verizon could not meet the required May 2, 2016 Service Date.  Pl. Mem. at 22.  Conversely, on November 19, 2015, when DISA evaluated Level 3's proposal, DISA knew that Level 3 could meet the required May 2, 2016 service date. Pl. Mem at 22 (citing AR Tab 23A, at 1067 (e-mail showing that the initial technical evaluation of Level 3's offer was completed on November 19, 2015)).

Second, with respect to the permit requirements, Standard Provision 27 of the Solicitation stated that, "inability of [a bidder] to obtain any [required] approval or permit shall not be a valid basis for not meeting the service date or providing service."  AR Tab 5, at 158.

In response, Verizon stated that:

Verizon Understands/Will Comply with the understanding that Verizon may be delayed through no fault of its own in securing any permits necessary or this project. Should such delay result in a delay of performance, the parties will work together to resolve the issue. Upon Verizon's reasonable request, the Government may agree to grant an extension of time as may be reasonably necessary for Verizon to obtain such permits. *The delay in performance shall be excused until such permit is granted.*

AR Tab 12A, at 437 (emphasis added).  As such, Verizon's response did not comply with Standard Provision 27 of the Solicitation.

Third, with respect to the firm-fixed price requirement, Standard Provision 4 stated that: "All charges quoted shall be understood to be firm fixed prices for all the life of the contract. Firm fixed price quotes must account for all applicable charges (e.g., charges from Subcontractors or other Contractors/TPs, taxes, surcharges, universal service fund, fees, etc.), and these charges may not be billed separately." AR Tab 5, at 156.  Verizon's offer, however, did not comply with the Solicitation, because its offer was qualified: "[i]n the event a new tax or similar charge arises or becomes applicable during the term and has a material impact on circuit costs, such an event would be beyond Verizon's control and Verizon will work with the Government to revise contract rates

to address the change." AR Tab 12A, at 434. In short, Verizon's failure to provide a firm, fixed-price offer renders Verizon's offer unresponsive. *See U.S. Security Associates, Inc. v. United States*, 124 Fed. Cl. 433, 437 (2015) ("The offer tendered by [the bid protestor] cannot be accepted by the government without the addition of new terms. In the context of a fixed price procurement, that makes the protestor's bid non-responsive and deprives it of standing to challenge the award.").

Fourth, with respect to the Parameter Requirements, Article (M)(9)(C) of the Solicitation required that, in the case of outage, the contractor "shall provide preplanned restoral of the circuit in the event of failure within eight (8) hours. Maximum time to repair shall be 8 hours." AR Tab 5, at 178. But, Verizon's offer insisted on including a *force majeure* clause that provided that:

> Verizon shall not be liable for loss or damage . . . if such failure or delay of performance is due to causes beyond Verizon's reasonable control . . . including . . . cable cuts . . . . Any delay resulting therefrom shall extend performance accordingly or excuse performance by Verizon in whole or in part, as may be reasonable.

AR Tab 12A, at 425.

Not only is this *force majeure* clause "impermissibly broad," but it is significantly different from the analogous FAR provision. Pl. Mem. at 26 (citing FAR 52.249-14 (providing a clause to be inserted governing excusable delays, stating that "the Contractor shall not be in default because of any failure to perform this contract under its terms if the failure arises from causes beyond the control and without the fault or negligence of the Contract")).

In addition, DISA's decision that Level 3's offer was not "technically acceptable" was arbitrary, capricious, and an abuse of discretion, for the following reasons.

First, Level 3's working path did not traverse Iran. AR Tab 5, at 153 ("No part of the working path service shall go through or touch Iran[.]"). Level 3's offer expressly stated that "[w]orking path does not touch or go through Iran[.]" AR Tab 11A, at 397. And, Level 3's offer expressly stated that "Level 3's offer utilizes a working path *that is identical to the current STM-16(6Q6j)* [*i.e.*, the circuit then currently in use] from Camp Arifjan to Weisbaden." AR Tab 11A, at 392 (emphasis added).

DISA's determination that Level 3's path traversed Iran, however, appears to have been based solely on a map that depicted the entire length of Level 3's circuit path from Germany to Kuwait. Because the scale of the map and the thickness of the line showing the circuit path, the map appears as though the circuit path touches the Iranian border. AR Tab 17 at 548 (Mar. 14, 2016 Decl. of John Shuttleworth, Level 3's Senior Director of Sales Engineers, stating that "given the scale of these maps, the width of the black line on the map is much wider than the actual cable line and represents a distance between twenty-five (25) and fifty (50) miles, whereas the right-of-way for the actual circuit is approximately fifty (50) feet"). Therefore, DISA's reliance on the map, without regard to the written statement in Level 3's offer was arbitrary, capricious, and abuse of discretion. Pl. Mem. 28.

Second, DISA also found Level 3's offer to be "technically unacceptable," because Level 3 did not submit the electronic .kmz files showing its routing map.  But Standard Provision 39 of the Solicitation only required that bidders provide "as-built drawings" of "[r]oute maps for each link or span," and that "[t]his documentation must be provided in electronic format." AR Tab 5, at 159.  Standard Provision 39 also provided that, "Acceptable formats are Microsoft Office (PowerPoint, Word, and Excel), Visio, AutoCAD, and AdobePDF."  AR Tab 5, at 160.

In addition, Standard Provision 39, also required that:

> path documentation shall be submitted with the quote for the Government to complete the evaluation . . . .  Format for path documentation must either be .kmz or .kml routing maps depicting the physical route for the terrestrial segments at a sufficient level of detail to identify each central office or switching stations, cable heads, cable stations and the approximate routing for undersea cable segments.

AR Tab 5, at 160.

Therefore, Standard Provision 39 required only that an offeror *prepare* the route maps in a .kmz format, and *submit* those documents in a Adobe .pdf format.  Pl. Mem. at 30 (emphasis added).  Nothing in Standard Provision 39 required that only .kmz format routing maps must be used to determine whether the route, at issue, avoided Iran.  Pl. Mem. at 30. Instead, Standard Provision 39 stated that the .kmz maps were to be used to identify "the physical route for the terrestrial segments *at a sufficient level of detail to identify each central office or switching stations, cable heads, cable stations and the approximate routing for undersea cable segments of the lease*."  AR Tab 5, at 160 (emphasis added).  Therefore, DISA's reliance only on the routing map provided by Level 3 (in .pdf format) to determine whether the circuit traversed Iran, was arbitrary, capricious, and contrary to law.

In addition, DISA also found that Level 3's offer was "technically unacceptable," because Level 3 did not provide evidence that its Turkish subcontractors were NALLA accredited.  But, Standard Provision 8 provided that:

> One or more end points of this circuit terminate in NATO countries that have National Long Line Agencies (NALLAs) and NALLA accredited Telecommunication Providers (TPs) . . . quotes shall provide evidence TP and all other subcontractor TPs possess required NALLA accreditations . . . for countries where this circuit *terminates*.  Evidence of such NALLA accreditation . . . is a definitive responsibility criterion.

AR Tab 5, at 156 (emphasis added).

Level 3's proposed circuit terminated in Germany, a NATO member, and in Kuwait, a country that is not a NATO member.  Pl. Mem. at 32.  Therefore, Level 3 provided evidence of NALLA accreditation for Germany.  Pl. Mem. at 32.  Although Level 3's circuit did pass through Turkey, a NATO country, Standard Provision 8 required only that the offeror provide NALLA accreditation for the countries where the circuit *terminated*.  Pl. Mem. at 31 (emphasis added).

Level 3 complied with this requirement.  Pl. Mem. at 32.  Furthermore, the CO engaged in disparate treatment with respect to this provision, because the CO found Verizon's offer "technically acceptable," when Verizon also did not provide evidence of NALLA accreditation for its Turkish subcontractor.  Pl. Mem. at 32.

Level 3 also argued that it had a NALLA accredited subcontractor in Turkey.  Pl. Reply at 13.  Standard Provision 8 required offerors to list "all subcontractors."  AR Tab 5, at 156.  Level 3 listed "all" of its subcontractors because 89 Degrees was the only subcontractor used by Level 3.  Pl. Reply at 13.  Level 3's subcontractor 89 Degrees in turn subcontracted with another company: Turkish Telecom, A.C. ("Turkish Telecom"), the same NALLA accredited TP for Turkey identified in Verizon's offer.  Pl. Reply at 13.  Although Level 3's offer did not state that 89 Degrees had sub-subcontracted with Turkish Telecom, there was no requirement under the Solicitation to list "second-tier subcontractors."  Pl. Reply at 13.

## 2.    The Government's Response.

The Government responds that, Level 3's offer  included "three fatal errors," so that DISA's decision, finding Level 3's offer was not "technically acceptable,"  was not irrational, arbitrary, capricious, nor contrary to applicable law.  Gov't Resp. at 7, 10.  First, the map submitted by Level 3, as shown below, evidences that the circuit path crossed over into the Iranian border.  Gov't Resp. at 10–11.  Specifically, the image, shown below, and the region within the red circle shows the working path (the black line) coming into contact with the Iranian border (the yellow line):



Gov't Resp. at 11; *see also* AR Tab 11, at 392.

Second, the Solicitation's Standard Provision 39 required that Level 3 to submit Google Earth files, either in .kmz or .kml format:

> Path documentation shall be *submitted with the quote* for the Government to complete the evaluation and its accuracy confirmed by the supplier prior to being considered for an award. *Format for path documentation must either be .kmz or .kml routing maps depicting the physical route* for the terrestrial segments . . . .

AR Tab 5, at 159–160 (emphasis added).

Level 3's argument that offerors should prepare maps in .kmz format and then submit them in .pdf format is "completely untenable." Gov't Resp. at 13. Although Standard Provision 39 required path documentation to be "*submitted*," Standard Provision 39 did not use the word "prepare" in connection with the .kmz files. Gov't Resp. at 13.

Third, Level 3 also was required to identify a NALLA accredited subcontractor for its route through Turkey. Gov't Resp. at 14. But, Level 3 cites only part of Standard Provision 8 that states that, "quotes shall provide evidence [of] NALLA accreditations . . . for countries where this circuit terminates." AR Tab 5, at 156. Level 3 ignores additional language that provided: "only TPs accredited by NALLAs of respective NATO countries will be eligible to receive an Order or Circuit Demand resulting from this Inquiry, for NATO Country portions of this circuit." AR Tab 5, at 156. Read together, these two parts of Standard Provision 8 require offerors to provide evidence of NALLA accreditation for their subcontractors at the place where the circuit terminated, *and* also list or identify NALLA subcontractors in all other NATO countries where the circuit traversed. Gov't Resp. at 15. Instead, Level 3 provided evidence of NALLA accreditation for itself and its German subcontractor, but failed to identify a NALLA accredited subcontractor for Turkey. Gov't Resp. at 15.

Although Verizon also failed to provide evidence of NALLA accreditation for its Turkish subcontractor, Verizon was only required to *identify* a NALLA subcontractor for Turkey. Gov't Resp. at 15 (emphasis added).[13] Therefore, DISA did not engage in disparate treatment with regard to Level 3's offer.

In response to the additional argument that Level 3 listed "all" of its subcontractors, as required by Standard Provision 8, the Government contends that "all" means "all," and that Level 3 was required to list not only its first-tier subcontractor, 89 Degrees, but also all secondary subcontractors. Gov't Reply at 6.

In addition, DISA properly evaluated Verizon's offer and its decision to award the contract to Verizon was not arbitrary, capricious, or contrary to law. Govt. Resp. at 6. First, none of the "so-called exceptions" identified by Level 3 were included in the circuit demand order issued by the Government after the award was made. Gov't Resp. at 16. In fact, the exceptions included in

---

[13] Verizon's offer names Turkish Telecom A.C. ("Turkish Telecom") as its subcontractor for Turkey and Turkish Telecom is the only NALLA accredited subcontractor in Turkey. Gov't Resp. at 15.

Verizon's offer simply restate terms included in Verizon's basic ordering agreement with DISA,[14] and did not materially alter the rights and obligations of the parties.  Gov't Resp. at 18.  But, even assuming *arguendo* that the exceptions differed from the rights and obligations incorporated in the basic agreement, they were "minor informalities or irregularities," and, under section 14.405 of the FAR,[15] "can be corrected or waived without being prejudicial to other bidders."  Gov't Resp. at 17 (citing FAR 14.405)).

With respect to Level 3's contention that Verizon could not meet the required service date, Verizon's offer stated that it could provide the circuit by the May 2, 2016 service date, if the award was received by December 4, 2015.  AR Tab 21B, at 1017.  Level 3's bid included similar language stating that Level 3 needed 60 days of lead time and could meet the May 2, 2016 service date only if award was received 60 days prior to May 2, 2016.  AR Tab 11, at 345.

---

[14] FAR 16.703(a)  provides:

A basic ordering agreement is a written instrument of understanding, negotiated between an agency, contracting activity, or contracting office and a contractor that contains (1) terms and clauses applying to future contracts (orders) between the parties during its term, (2) a description, as specific as practicable, of supplies or services to be provided, and (3) methods for pricing, issuing, and delivering future orders under the basic ordering agreement. A basic ordering agreement is not a contract.

48 C.F.R. § 16.703(a).

A basic ordering agreement incorporates clauses into the individual orders issued to successful bidders.  FAR 16.703(a).  Both Verizon and Level 3 entered into basic ordering agreements with DISA's Defense Information Technology Contracting Organization ("DITCO"). AR Tab 1, at 1 (Verizon Basic Ordering Agreement); AR Tab 3, at 115 (Level 3 Communications Basic Ordering Agreement).  Standard Provision 1 of the Solicitation required offerors to have entered into a basic ordering agreement with DITCO.  AR Tab 5, at 155.

[15] FAR 14.405 provides:

A minor informality or irregularity is one that *is merely a matter of form and not of substance*. It also pertains to some immaterial defect in a bid or variation of a bid from the exact requirements of the invitation that can be corrected or waived without being prejudicial to other bidders. The defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired. The contracting officer either shall give the bidder an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid or waive the deficiency, whichever is to the advantage of the Government.

48 C.F.R. § 14.405 (emphasis added).

With respect to Level 3's contention that Verizon improperly took exception to the permit requirements, Verizon stated that it would comply with the requirement. AR Tab 21, at 1025 (stating that Verizon "Understands/Will Comply" with Standard Provision 27's permit requirement). In addition, Verizon clarified that "[u]pon Verizon's reasonable request, the Government *may* agree to grant an extension of time as may be reasonably necessary to obtain such permits" and that "the delay in performance shall be excused until such permit is granted." AR Tab 21, at 1025 (emphasis added). But, this was not a material exception to the Solicitation's terms, because Verizon did not demand a right to an extension; it only allowed DISA the option of agreeing to allow a requested extension. Gov't Resp. at 19.

With respect to Level 3's contention that Verizon failed to provide a firm-fixed price as required by the Solicitation, Verizon's bid stated that, "Verizon will work with the Government to revise contract rates," if a new tax or similar charge arises that has a material impact on circuit costs. AR Tab 21, at 1022. This repeated the basic ordering agreement that incorporated Defense Federal Acquisition Regulation Supplement ("DFARS") clauses 252.239-7005[16] and 252.239-7006.[17]

With respect to Level 3's contention that Verizon took exception to the terms of the Solicitation by the insertion of the *force majeure* clause, that addition restated the excusable delay clause that is incorporated into the IQO process through the basic ordering agreement between DISA and Verizon. AR Tab 1, at 20 (basic ordering agreement providing that "[t]he Contractor

---

[16]   DFARS 252.239-7005(b)(1) provides that "[t]he Contractor shall furnish the services and facilities under this agreement/contract in accordance with . . . [a]ll applicable tariffs, rates, charges, rules, regulations, or requirements." 48 C.F.R. § 252.239-7005(b)(1).

[17] DFARS 252.239-7006 provides:

(a) The Contractor shall provide to the Contracting Officer —

> (1) Upon request, a copy of the Contractor's current existing tariffs (including changes);
>
> (2) Before filing, any application to a Federal, State, or any other regulatory agency for new or changes to, rates, charges, services, or regulations relating to any tariff or any of the facilities or services to be furnished solely or primarily to the Government; and
>
> (3) Upon request, a copy of all information, material, and data developed or prepared in support of or in connection with an application under paragraph (a)(2) of this clause.

(b) The Contractor shall notify the Contracting Officer of any application that anyone other than the Contractor files with a governmental regulatory body which affects or will affect the rate or conditions of services under this agreement/contract. These requirements also apply to applications pending on the effective date of this agreement/contract.

48 C.F.R. § 252.239-7006.

shall be liable for default unless nonperformance is caused by the occurrence beyond the reasonable control of the Contractor"). The "cable cuts" identified by Verizon in its *force majeure* clause would be an occurrence beyond Verizon's reasonable control.   AR Tab 1, at 20. Furthermore, Level 3's basic ordering agreement incorporated FAR 52.212-4(f)[18] by reference, an analogous provision that relieved Level 3 of responsibility for excusable delays.   AR Tab 3, at 119 (listing § 52.212-4 as one of the clauses incorporated by reference).

### 3.   Verizon Deutschland GmbH's Response.

Verizon adds that Level 3's protest fails to meaningfully address the applicable standard of review and instead seeks to have the United States Court of Federal Claims to sit as a super evaluation panel to select the awardee. D.I. Resp. at 1.  "This is not the role of the [c]ourt or the bid protest process." D.I. Resp. at 1.  Instead, the court must review whether the agency complied with procurement laws and the Inquiry Quote Order terms. D.I. Resp. 1.

Level 3 has a "heavy burden" to establish that DISA's action was arbitrary, capricious, or contrary to law. D.I. Resp. at 2.  Specifically, Level 3 must demonstrate that DISA's actions lacked a "rational basis." *See Sys. Application & Techs., Inc. v. United States*, 100 Fed. Cl. 687, 717 (2011) ("[T]he court will not disturb the ratings assigned by the agency absent a showing that they have no rational basis.").  Level 3's arguments, however, are tantamount to a "mere disagreement with the subjective judgment of the agency evaluators." D.I. Resp. at 2.  Therefore, Level 3's protest should be denied.

### 4.   The Court's Resolution.

#### a.   The Contracting Officer's Decision Not To Seek A "Clarification" From Level 3 Was Arbitrary, Capricious, And An Abuse Of Discretion.

Level 3's September 29, 2016 Amended Complaint alleges that the CO violated FAR 15.101-2 and 15.306(a), by failing to seek a "clarification" from Level 3 regarding the lack of a

---

[18] FAR  52.212-4(f) provides:

Excusable delays. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers. The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

48 C.F.R. § 52.212-4.

.kmz routing map, and determining that Level 3's working path traversed Iran, although Level 3's written statement was to the contrary.  Amend. Compl. at ¶¶ 107, 115.[19]

FAR 15.101-2 regulates the lowest price "technically acceptable" source selection process, *i.e.*, the process used in this case.  AR Tab 5, at 150 ("[T]he Government will first evaluate the lowest price quote.  If the lowest price quote is determined to be technically acceptable and otherwise properly awardable, no further evaluation will be conducted, and award will be made."). FAR 15.101-2(b)(4) provides that "exchanges [between the CO and the offeror] may occur," pursuant to FAR 15.306.

If the CO enters into "discussions," *i.e.*, "[n]egotiations . . . between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal . . . [that] take place after establishment of the competitive range," they must be conducted with all the offerors within the competitive range.  FAR 15.306(d).  But, FAR 15.306(a)(1)-(2) allows the CO to seek a "clarification" from offerors, without initiation of "discussions."   In contrast, "clarifications" are defined as "limited exchanges, between the government and offerors that may occur *when award without discussions is contemplated*."  FAR 15.306(a)(1) (emphasis added).[20] "Clarifications" allow offerors "the opportunity to clarify certain aspects of proposals (*e.g.*, the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors."  FAR 15.306(a)(2).

FAR 15.306(a)(2) clearly differentiates "discussions" from "clarifications," *i.e.*, negotiations that lead to changes to the proposal.  The United States Court of Appeals for the Federal Circuit has explained that it is "clear that discussions are more substantial communications than minor clarifications."  *Information Tech. & App. Corp. v. United States*, 316 F.3d 1312, 1320

---

[19] Level 3 also argues that the Solicitation did not require them to submit .kmz files in the first place, and that Standard Provision 39 instead required them to *prepare* the route maps in .kmz format but then submit them in .pdf format.  Pl. Mem. at 30.  This argument, however, is contrary to Standard Provision 39, that provided: "path documentation *shall be submitted* with the quote for the Government to complete the evaluation" and that "[f]ormat for path documentation must be either .kmz or .kml routing maps."  AR Tab 5, at 160.

[20] The definition of "clarification" is the result of an amendment made to the FAR in 1997. *See* 62 Fed. Reg. 51,224 (Sept. 30, 1997); *see also Information Tech. & App. Corp. v. United States*, 316 F.3d 1312, 1320 (Fed. Cir. 2003) (reviewing the regulatory history of FAR 15.306(a)(2) and holding that communications for the purpose of obtaining the past-performance history of subcontractors listed in offeror's proposal were "clarifications").  This amendment was enacted to "[s]upport[ ] more open exchanges between the Government and industry, allowing industry to better understand the [Solicitation] and the Government to better understand industry proposals."  62 Fed. Reg. 51,224 (Sept. 30, 1997).  This is reflected in the new definition of "clarification:" "[w]e drafted the rule to *allow as much free exchange of information between offerors and the Government as possible*, while still permitting award without discussions and complying with applicable statutes."  *Id.* at 51, 228–29.

(Fed. Cir. 2003) (internal quotation marks omitted). But, "there is no requirement in the regulation that a *clarification* not be essential for evaluation of the proposal." *Id.* at 1323 (emphasis added). In fact, "'clarifications' by [an] offeror could lead to an increase in [the offeror's] past performance score or *perhaps tilt the award in its favor.*" *Id.* (quoting John S. Pachter *et al.*, "The FAR Part 15 Rewrite," 98-05 Briefing Papers 1, 6 (1998)) (emphasis added).  In other words, "clarifications" are deemed information exchanges that do not alter the terms of the offer, but can be determinative in the evaluation process.

In this case, an inquiry about the absence of .kmz files in Level 3's offer would be a "clarification," not a "discussion."  Submission of the .kmz files would not have varied the terms of Level 3's offer, because the written offer expressly stated that Level 3's proposed circuit would follow the same paths used in the current circuit maintained by Level 3 and that Level 3's working path did not traverse Iran.  AR Tab 11, at 392 ("Level 3's proposal utilizes a working path that is identical to the current [path] from Camp Arifjan to Wiesbaden."), 397 ("Working path does not touch or go through Iran[.]").  Asking for submission of the .kmz file would allow the CO to confirm Level 3's proposal.  *See* 62 FED. REG. 51, 228 (Sept. 30, 1997).  For this reason, a TET Member recommended a "clarification," by asking the Contracting Specialist to request a .kmz file from Level 3:

> There are gaps in the diagrams between Stara Zagora, Bulgaria, and Budapest, Hungary and Ivancice, Czech Republic. *Please ask the offeror to provide the detailed routing .kmz/.kml file.*  The file should provide a more detailed routing between Bulgaria and Hungary as well as the routing between Hungary and Czech Republic.

AR Tab 20, at 912 (emphasis added).

Although FAR 15.036 is permissively worded,[21] the United States Court of Federal Claims has determined that a CO's decision not to seek "clarifications" can constitute an abuse of discretion under certain circumstances.  *See BCPeabody Construction Services, Inc. v. United States*, 112 Fed. Cl. 502, 512 (2013) (Lettow, J.).  In *BCPeabody*, the United States Army Corps of Engineers issued a solicitation utilizing the "lowest price technically acceptable source selection process," under FAR 15.101-2, *i.e.*, the same evaluation process utilized by the Solicitation in this case.  *Id.* at 505.  The protestor submitted an offer deemed technically unacceptable, because the offer failed to include a "project information sheet" detailing the past performance of one of protestor's subcontractors.  *Id.* at 505–06.  The protestor, however, also quoted a price that was more than $1,000,000 less than the price of the offer selected for award.  *Id.* at 506.  The court determined that the protestor's failure to include the project information sheet was not a "major omission that made it impossible to fully evaluate [the] proposal," but was a clerical error that could have been corrected by seeking a "clarification." *Id.* at 512–13.  The court concluded that "[g]iven [the protestor's] *significantly lower bid*, the contractor officer had virtually overwhelming cause to [seek a "clarification"]," and that the failure to seek a "clarification" was a prejudicial abuse of discretion.  *Id.* at 512 (emphasis added).

---

[21] "Clarifications are limited exchanges, between the Government and offerors *that may occur* when award without discussions is contemplated."  FAR 15.306 (emphasis added).

22

Like the omission of the pricing information sheet in *BCPeabody*, the omission of the .kmz file in this case was an oversight that easily could have been corrected. It was not a major omission that made it impossible to fully evaluate Level 3's proposal. Although Level 3's low definition .pdf maps made it appear that Level 3's working path touched Iran, the court notes that DISA approved of the working path when they awarded Level 3 the initial contract. AR Tab 20, at 826 ("Level 3's proposal utilizes a working path that is identical to the current STM-16 (6Q6J) from Camp Arifjan to Wiesbaden."). That fact together with Level 3's written representation that the path did not touch Iran and the proposed working path would follow the same path as the circuit currently provided by Level 3, evidence that the CO's decision not to seek a "clarification" was arbitrary and capricious and an abuse of discretion. AR Tab 11, at 392, 397.

In this case, as in *BCPeabody*, the CO had "virtually overwhelming cause" to seek clarification from Level 3, because of its "significantly lower" price. The price difference in *BCPeabody* was more than $1 million; in this case; the difference in this case is approximately $38.6 million.

For these reasons, the court has determined that the CO's decision not to seek a "clarification" regarding the .kmz routing map, in light of Level 3's written statement was arbitrary, capricious, and an abuse of discretion.

> **b.    The Contracting Officer's Decision Regarding NALLA Accreditation Was Arbitrary, Capricious, And An Abuse Of Discretion.**

The CO found that Level 3's offer was "technically unacceptable," because it did not provide a NALLA accredited subcontractor for the nation of Turkey, as required by Standard Provision 8 of the Solicitation. AR Tab 20, at 962 ("Straight line diagram on page 54 identifies subvendor NT in Turkey, but the proposal does not state that the NT is NALLA accredited s required in Standard Provision 8.").

Standard Provision 8 of the Solicitation provided:

> One or more end points of this circuit terminate in NATO countries that have National Long Lines Agencies (NALLAs) and NALLA accredited Telecommunication Providers (TPs). As a member and signatory in North Atlantic Treaty Organization (NATO), the U.S. Department of Defense acquires its military telecommunication services in accordance with NATO requirements specified in Alliance Long Lines Activity (ALLA) handbook. Therefore, only TPs accredited by NALLAs of respective NATO countries will be eligible to receive any Order or Circuit Demand resulting from this Inquiry, for NATO country portions of this circuit. Additionally, only NALLA accredited TPs can be used as subcontractor TP in NATO countries. In NATO countries having no NALLA and/or NALLA accredited TP, quotes from TPs possessing authorization to provide communication services from appropriate national authority will be considered. Quotes shall identify portions of service that will be provided using TP's own facilities as well as those that will be provided by subcontractor TPs, and shall identify all subcontractor TPs. Additionally, quotes shall provide evidence TP and all

subcontractor TPs possess required NALLA accreditations or national authority authorizations for countries where this circuit terminates. Evidence of such NALLA accreditation and national authority authorizations for TP and all subcontractor TPs is a definitive responsibility criterion.

ACCEPTABLE TELECOMMUNICATIONS PROVIDER (TP) RESPONSE: "UNDERSTAND," and identify all portions of service provided by TP and all portions of the service provided by subcontractor TPs, plus provide evidence that TP and all subcontractor TPs possess required NALLA accreditations and national authority authorizations.

AR Tab 5, at 156.

The interpretation of a solicitation is a question of law. *See NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("The interpretation of a contract or solicitation is a question of law which we review de novo."). Determining the ambiguity of a solicitation is likewise a question of law. *Id.* (citing *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993)). The court begins with the plain language of the solicitation. *See Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1353 (Fed. Cir. 2004). And, the court must consider the solicitation as a whole and interpret it in a "manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.*

The plain language of Standard Provision 8 of the Solicitation requires an offeror to provide evidence of NALLA accreditation for the offeror and all subcontractor TPs that would be working in NATO countries or, alternatively, provide national authority authorization where NALLA does not apply, *i.e.*, in NATO countries that do not have NALLA accredited TPs. Standard Provision 8 states that "only NALLA accredited TPs can be used as subcontractor TP in NATO countries," and the text regarding "Acceptable Response" also states that an offeror is to "provide *evidence* that [the offeror] and all subcontractor TPs *possess required NALLA accreditations* and national security authorizations." AR Tab 5, at 156 (emphasis added).

Level 3 provided evidence of NALLA accreditation by citing to a NALLA website listing Level 3 and Interoute Germany GmbH—the subcontractor Level 3 had selected for Germany—as NALLA accredited. AR Tab 20, at 837. But, Level 3 did not provide evidence that NT and 89 Degrees—the subcontractors it selected for Turkey—had NALLA accreditation. AR Tab 20, at 830 (combined working path and protect path diagrams showing NT as the TP for Turkish portion of route); AR Tab 20, at 831 (working path diagram showing NT and 89 Degrees as subcontractors for Turkish portion of route). But, Verizon also failed to meet this requirement, since Verizon's offer listed Turkish Telecom as its subcontractor for Turkey, but did not provide any evidence that Turkish Telecom was NALLA accredited, nor did Verizon's offer state that Turkish Telecom was NALLA accredited.[22]   AR Tab 12A, at 422, 435 (providing Turkish Telecom as Verizon's

---

[22] The CO and the administrative staff reviewed the NALLA interface and determined that Turkish Telecom was the only NALLA accredited TP for Turkey. AR Tab 20, at 568 (April 13, 2016 Agency Report to GAO). But, this does not change the fact that Verizon failed to evidence NALLA accreditation with its offer.

subcontractor TP for Turkey).  Verizon also failed to include evidence of NALLA accreditation where the working path terminated.  Verizon's working path diagram shows that the terminating portions of the circuit in Germany are provided by Deutsche Telekom ("DT").  AR Tab 12A at 422.  Verizon's answer to Standard Provision 8 includes the statement that "Verizon and Deutsche Telekom are NALLA accredited in Germany."  AR Tab 12A, at 435.  But, this statement is not "evidence" of NALLA accreditation.

Because both Verizon and Level 3 did not comply with Standard Provision 8, the CO engaged in disparate treatment when Verizon was found to be "technically acceptable," but Level 3 was not.  As such, the CO's decision was arbitrary, capricious, and an abuse of discretion.

### c.  The Contracting Officer's Decision Not To Conduct Negotiations With Offerors Was Arbitrary, Capricious, And An Abuse Of Discretion.

COs "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  Thus, as a matter of law, if the CO's decision reflects "rational reasoning and consideration of relevant factors," the court is required to defer to the CO's decision, even if it is one the court would have determined differently.  *See Savantage Fin. Servs. v. United States*, 595 F.3d 1232, 1286 ("[W]e must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors") (internal quotations omitted); *see also Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) ("If the court finds a reasonable basis for the agency's [procurement decision], the court should stay its hand even though it might, as an original proposition, have reached a different conclusion [.]")  Nevertheless, the court must be "enabled to perform reasonable review within the strictures of the APA."  *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).

As the United States Supreme Court has explained, an agency violates the APA when it "*entirely failed to consider an important aspect of the problem*, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added).

In this case, the CO failed to consider an "important aspect of the problem:" the fact that Level 3's offer was approximately $38.6 million[23] *less* than Verizon's.  Under these circumstances, the CO should have entered into negotiations with offerors, since Standard Provision 24 expressly reserves that right.  AR Tab 5, at 158.

Nominally, DISA was interested in getting the new telecommunication line up and running as soon as possible, but DISA revised the service date from November 30, 2015 to May 2, 2016.  But, DISA awarded the contract to Verizon with knowledge that Verizon could not meet the May 2, 2016 service date, because of the required 150 day lead time. AR Tab 7, at 271 (amendment to

---

[23] Level 3 quoted a price of $60,128.000.00; Verizon quoted a price of $98,664,800.00. AR Tab 14, at 498.  The difference between the two price quotes is $38,536,800.

the required service date from November 30, 2016 to May 2, 2016); AR Tab 21B, at 1017 (Verizon's offer providing 150 days of lead time).  Therefore, the essence of time was not a dispositive factor preventing negotiations to obtain the best value for the agency.

During the hearing on the parties' Cross-Motions For Judgment On The Administrative Record, the court asked why the Government did not seek any "clarification," about the concerns raised between the map and Level 3's written representations and past performance, in light of the $38.6 million difference between Level 3's and Verizon's offers:

> THE COURT: The Government awarded a contract to Verizon, which was $30 million more than the people who had been doing the job --
>
> [THE GOVERNMENT]: That's correct.
>
> THE COURT: -- based on the map. And no one bothered to think about picking up the phone and saying hmm, hmm -- as my grandson [Roark] would say -- I wonder if there's a problem with the map? Or was something else going on?

9/15/16 TR at 25.

In a recent article, Professor Ralph C. Nash described the CO's decision in this case to award the contract to Verizon as "egregious," and, in analyzing the GAO's June 21, 2016 decision denying Level 3's protest, observed that:

> We certainly agree with the GAO that it is an offeror's responsibility to submit a perfect proposal or quotation and that it deserves to be punished for not doing so . . . .  However, we don't agree that the Government should also be punished when this happens. This is especially true when the punishment costs the taxpayers multimillions of dollars.  Our complaint here is with the Contracting Officer that concluded that there was no need for discussions with these two offerors . . . .  Such a step would have taken a week or two but would have saved U.S. taxpayers millions of dollars. . . .  Our current competitive negotiation process constitutes a critiquing of proposal language, not an endeavor to negotiate the best deal for the Government.  If we were trying to make up a scenario to illustrate this point, we would have never come up with as clear an example as *Level 3*.

Vernon J. Edwards and Ralph C. Nash, "Our Competitive Process: It's Expensive!," 30 No. 9 Nash & Cibinic Rep. ¶ 48 (Sept. 2016).

Under these circumstances, the court has determined that the CO's decision not to enter into negotiations in light of the significant price disparity was arbitrary, capricious, and an abuse of discretion.

### E.      Level 3 Communications, LLC Is Entitled To Injunctive Relief.

To determine if an injunction is warranted, the court must consider whether: "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant

of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *see also FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) ("*No one factor*, taken individually, *is necessarily dispositive* . . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of others.") (emphasis in original); *see also* RCFC 65(a).

With respect to success on the merits, Level 3 has met its burden of demonstrating that the CO's technical evaluation and subsequent award decisions was contrary to law and/or was arbitrary, capricious, and an abuse of discretion.

With respect to irreparable harm, Level 3 has already suffered irreparable harm in the form of a lost opportunity to fairly compete for the contract. *See PGBA, LLC v. United States*, 57 Fed. Cl. 655, 664 (2003) ("This court has acknowledged that a lost opportunity to compete may constitute an irreparable harm[.]"). In addition, because the Government already owes Verizon $2,9540,400 for set up costs and the first month of performance, Level 3 has also been deprived of potential profits. *See Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) ("Here, absent injunctive relief, [the protester] will lose the opportunity to earn the profit it would have made under this contract."). This injury also constitutes irreparable harm. *See Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 520 (2012) ("The court has repeatedly held that the 'the lost potential profits' from a government contract constitutes irreparable harm.").

With respect to the balance of the hardships, Verizon would suffer economic hardship if the contract award is rescinded, but Level 3 would suffer a greater hardship if it is awarded only bid preparation costs and is not given a chance to fully and fairly compete. The Government also argues that "more bandwidth is critically needed" to support DISA's military activities in the Middle East, and that the Government would be harmed by the delay if DISA was required to reevaluate proposals. Gov't Resp. at 25–26; Gov't Reply at 15–16. But, the administrative record demonstrates that DISA has already allowed the service date to be extended from November 30, 2015 to May 2, 2016, and that DISA awarded the contract to Verizon with knowledge that Verizon could not meet the May 2, 2016 service date due to its 150 day lead time. AR Tab 7, at 271 (amendment to the required service date from November 30, 2015 to May 2, 2016); AR Tab 21B, at 1017 (Verizon's offer providing 150 days of lead time). In other words, although the additional bandwidth provided under the contract is important to the Government, DISA's past conduct indicates that timeliness is not a critical component of this procurement.

With respect to the public interest, the court has determined that the public interest is best served when the Government complies with procurement statutes and the FAR, and when the contracting officer exercises discretion to obtain a best value for the agency.

## IV.   CONCLUSION.

For reasons discussed herein, Level 3's Motion For Judgment On The Administrative Record is granted. The Government's and Verizon's Motions For Judgment On The Administrative Record are denied. All other pending motions are dismissed as moot.

The Defense Information Systems Agency is enjoined from allowing Verizon Deutschland GmbH to continue performance under the Circuit Demand IQO Contract, No. HC1021-16-M-

0012, or any other procurement contract or vehicle associated with this bid protest. This procurement is remanded to the Defense Information Systems Agency for six months to determine whether to issue a new Solicitation or otherwise correct the deficiencies identified herein. During that time, the Government will provide the court with a report on the status of the remand every 90 days. *See* RCFC 52.2.

Level 3 is awarded bid preparation costs. *See* 28 U.S.C. § 1491(b)(2); *see also* RCFC 54(d)(1).

On or before January 3, 2017, the Government is advised to show cause why the Government's written and oral representations to the court that performance of the contract with Verizon would not commence until December 1, 2016 does not violate RCFC 11(b).

In addition, the court hereby orders the Defense Information Systems Agency promptly to provide all pleadings, the Administrative Record, and all Memorandum Opinion and Orders in this case to the Inspector General of the Department of Defense for investigation into why the Contracting Officer awarded the contract at issue to Verizon at a price of $38.6 million more than the incumbent contractor and proceeded to commence performance contrary to written and oral representations to the court – and prior to the November 8, 2016 election.

In that regard, the court also intends to forward the public record in this case to the Senate Armed Services Committee for such oversight as it deems appropriate.


**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

28

**COURT APPENDIX:**
**CERTAIN RELEVANT STATUTORY AND REGULATORY PROVISIONS**

5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

>    (1) compel agency action unlawfully withheld or unreasonably delayed; and

>    (2) hold unlawful and set aside agency action, findings, and conclusions found to be--

>>    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>>    (B) contrary to constitutional right, power, privilege, or immunity;

>>    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

>>    (D) without observance of procedure required by law;

>>    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

>>    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

---

10 U.S.C. § 2305(b), in relevant part, provides that:

>    (b)(1) The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation.

*     *     *

>    (4)(A) The head of an agency shall evaluate competitive proposals in accordance with paragraph (1) and may award a contract—

i

(i) after discussions with the offerors, provided that written or oral discussions have been conducted with all responsible offerors who submit proposals within the competitive range; or

(ii) based on the proposals received, without discussions with the offerors (other than discussions conducted for the purpose of minor clarification) provided that the solicitation included a statement that proposals are intended to be evaluated, and award made, without discussions, unless discussions are determined to be necessary.

10 U.S.C. § 2305(b).

---

FAR 15.101-2, under the heading "Lowest Price Technically Acceptable Source Selection Process," provides:

(a) The lowest price technically acceptable source selection process is appropriate when best value is expected to result from selection of the technically acceptable proposal with the lowest evaluated price.

(b) When using the lowest price technically acceptable process, the following apply:

(1) The evaluation factors and significant subfactors that establish the requirements of acceptability shall be set forth in the solicitation. Solicitations shall specify that award will be made on the basis of the lowest evaluated price of proposals meeting or exceeding the acceptability standards for non-cost factors. If the contracting officer documents the file pursuant to 15.304(c)(3)(iii), past performance need not be an evaluation factor in lowest price technically acceptable source selections. If the contracting officer elects to consider past performance as an evaluation factor, it shall be evaluated in accordance with 15.305. However, the comparative assessment in 15.305(a)(2)(i) does not apply. If the contracting officer determines that a small business' past performance is not acceptable, the matter shall be referred to the Small Business Administration for a Certificate of Competency determination, in accordance with the procedures contained in subpart 19.6 and 15 U.S.C. 637(b)(7)).

(2) Tradeoffs are not permitted.

(3) Proposals are evaluated for acceptability but not ranked using the non-cost/price factors.

(4) Exchanges may occur (see 15.306).

48 C.F.R. § 15.101-2

---

FAR 15.305(a), under the heading "Proposal Evaluation," provides:

> Proposal evaluation is an assessment of the proposal and the offeror's ability to perform the prospective contract successfully. An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation. Evaluations may be conducted using any rating method or combination of methods, including color or adjectival ratings, numerical weights, and ordinal rankings. The relative strengths, deficiencies, significant weaknesses, and risks supporting proposal evaluation shall be documented in the contract file.

48 C.F.R. § 15.305(a).

---

FAR 15.306, under the heading "Exchanges With Offerors After Receipt Of Proposals," provides:

(a) Clarifications and award without discussions.

> (1) Clarifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated.

> (2) If award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors.

> (3) Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions. If the solicitation contains such a notice and the Government determines it is necessary to conduct discussions, the rationale for doing so shall be documented in the contract file (see the provision at 52.215–1) (10 U.S.C. 2305(b)(4)(A)(ii) and 41 U.S.C. 3703(a)(2)).

(b) Communications with offerors before establishment of the competitive range. Communications are exchanges, between the Government and offerors, after receipt of proposals, leading to establishment of the competitive range. If a competitive range is to be established, these communications—

> (1) Shall be limited to the offerors described in paragraphs (b)(1)(i) and (b)(1)(ii) of this section and—

(i) Shall be held with offerors whose past performance information is the determining factor preventing them from being placed within the competitive range. Such communications shall address adverse past performance information to which an offeror has not had a prior opportunity to respond; and

(ii) May only be held with those offerors (other than offerors under paragraph (b)(1)(i) of this section) whose exclusion from, or inclusion in, the competitive range is uncertain;

(2) May be conducted to enhance Government understanding of proposals; allow reasonable interpretation of the proposal; or facilitate the Government's evaluation process. Such communications shall not be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, and/or otherwise revise the proposal. Such communications may be considered in rating proposals for the purpose of establishing the competitive range;

(3) Are for the purpose of addressing issues that must be explored to determine whether a proposal should be placed in the competitive range. Such communications shall not provide an opportunity for the offeror to revise its proposal, but may address—

(i) Ambiguities in the proposal or other concerns (e.g., perceived deficiencies, weaknesses, errors, omissions, or mistakes (see 14.407)); and

(ii) Information relating to relevant past performance; and

(4) Shall address adverse past performance information to which the offeror has not previously had an opportunity to comment.

(c) Competitive range.

(1) Agencies shall evaluate all proposals in accordance with 15.305(a), and, if discussions are to be conducted, establish the competitive range. Based on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals, unless the range is further reduced for purposes of efficiency pursuant to paragraph (c)(2) of this section.

(2) After evaluating all proposals in accordance with 15.305(a) and paragraph (c)(1) of this section, the contracting officer may determine that the number of most highly rated proposals that might otherwise be included in the competitive range exceeds the number at which an efficient competition can be conducted. Provided the solicitation notifies offerors that the competitive range can be

limited for purposes of efficiency (see 52.215–1(f)(4)), the contracting officer may limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals (10 U.S.C. 2305(b)(4) and 41 U.S.C. 3703).

(3) If the contracting officer, after complying with paragraph (d)(3) of this section, decides that an offeror's proposal should no longer be included in the competitive range, the proposal shall be eliminated from consideration for award. Written notice of this decision shall be provided to unsuccessful offerors in accordance with 15.503.

(4) Offerors excluded or otherwise eliminated from the competitive range may request a debriefing (see 15.505 and 15.506).

(d) Exchanges with offerors after establishment of the competitive range. Negotiations are exchanges, in either a competitive or sole source environment, between the Government and offerors, that are undertaken with the intent of allowing the offeror to revise its proposal. These negotiations may include bargaining. Bargaining includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract. When negotiations are conducted in a competitive acquisition, they take place after establishment of the competitive range and are called discussions.

(1) Discussions are tailored to each offeror's proposal, and must be conducted by the contracting officer with each offeror within the competitive range.

(2) The primary objective of discussions is to maximize the Government's ability to obtain best value, based on the requirement and the evaluation factors set forth in the solicitation.

(3) At a minimum, the contracting officer must, subject to paragraphs (d)(5) and (e) of this section and 15.307(a), indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond. The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award. However, the contracting officer is not required to discuss every area where the proposal could be improved. The scope and extent of discussions are a matter of contracting officer judgment.

(4) In discussing other aspects of the proposal, the Government may, in situations where the solicitation stated that evaluation credit would be given for technical

solutions exceeding any mandatory minimums, negotiate with offerors for increased performance beyond any mandatory minimums, and the Government may suggest to offerors that have exceeded any mandatory minimums (in ways that are not integral to the design), that their proposals would be more competitive if the excesses were removed and the offered price decreased.

(5) If, after discussions have begun, an offeror originally in the competitive range is no longer considered to be among the most highly rated offerors being considered for award, that offeror may be eliminated from the competitive range whether or not all material aspects of the proposal have been discussed, or whether or not the offeror has been afforded an opportunity to submit a proposal revision (see 15.307(a) and 15.503(a)(1)).

(e) Limits on exchanges. Government personnel involved in the acquisition shall not engage in conduct that—

(1) Favors one offeror over another;

(2) Reveals an offeror's technical solution, including unique technology, innovative and unique uses of commercial items, or any information that would compromise an offeror's intellectual property to another offeror;

(3) Reveals an offerors price without that offeror's permission. However, the contracting officer may inform an offeror that its price is considered by the Government to be too high, or too low, and reveal the results of the analysis supporting that conclusion. It is also permissible, at the Government's discretion, to indicate to all offerors the cost or price that the Government's price analysis, market research, and other reviews have identified as reasonable (41 U.S.C. 2102 and 2107);

(4) Reveals the names of individuals providing reference information about an offeror's past performance; or

(5) Knowingly furnishes source selection information in violation of 3.104 and 41 U.S.C. 2102 and 2107.

48 C.F.R. § 15.306.

FAR 52.215-1(a), under the Heading "Instructions to Offerors- Competitive Acquisition," provides:

> Discussions are negotiations that occur after establishment of the competitive range that may, at the Contracting Officer's discretion, result in the offeror being allowed to revise its proposal.

48 C.F.R. § 52.215-1(a).